REID *v.* CALDWELL *et al.,* trustees.

1. When a contract for the purchase of a specified number of shares in a corporation was, save as to a single contingency, entire in its nature, and stipulated that the purchaser was to pay a part of the agreed price in cash and the balance in annual installments, he did not, unless such contingency happened, become entitled, by making the cash payment, to recover from the seller such a portion of the whole number of shares contracted for as that payment, had the contract been severable, would have paid for at the stipulated price per share.

2. While in such a case a breach of the contract by the seller might give to the purchaser the right to rescind and to recover damages, the latter could not maintain an action of trover for the partial number of shares claimed to have been paid for by the amount of the cash payment.

3. If in such a case all the shares were, under the terms of the contract, held by the seller as collateral security for the payment of the deferred installments, and he unlawfully made a sale of the shares at which he himself undertook to become the purchaser, the status of the title of the shares was not thereby in any manner changed or affected as against the interest or right of the purchaser.

Argued March 20,—Decided April 9, 1900.

Equitable petition. Before Judge Spence. Decatur superior court. May term, 1899.

*Donalson & Hawes,* for plaintiff.

*Townsend & Westmoreland* and *Bower & Bower,* for defendants.

COBB, J. Reid brought suit against C. H. Caldwell, J. M. Caldwell, and Charles O. Locke, "trustees representing the stockholders of the Flint River Lumber Company" (hereafter referred to as the Lumber Company), alleging substantially as follows: On February 19, 1896, plaintiff and W. A. Hamil entered into a written agreement with defendants, in which they were styled "trustees representing the stockholders" of the Lumber Company, and in which it was recited that defendants were the owners of the entire capital stock of the Lumber Company, and that they desired to secure "the personal services and skill and experience " of plaintiff and Hamil in the conduct and management of the business of the company; and that for that purpose they agreed to transfer to plaintiff and Hamil one half of the capital stock of the company, consisting of 500 shares — 375 to the plaintiff, and 125 to Hamil, such stock to be paid for at the rate of $64 per share, plaintiff to pay $7,500 on March 1, 1896, and to give his notes for the balance payable at different times. A similar arrangement was made for the payment of the amount due by Hamil. The notes were to bear interest. The certificates of stock were to be issued in the names of plaintiff and Hamil respectively, but were to be indorsed to defendants and held by them as security for the performance by plaintiff and Hamil respectively of the obligations undertaken by them in the agreement. The defendants were to have all claims due the company prior to March 1, 1896, and to pay all debts of the company contracted before that date, and if necessary they were to secure or advance the means required to equip and operate the mill. Plaintiff and Hamil were to devote their entire time and services to the business of the company, and were to be paid salaries to be fixed by the directors. The affairs of the company were to be under the control of a board of directors composed of the Caldwells, Hamil, and plaintiff. " In the event of the death "

of plaintiff and Hamil, or either of them, before their notes were paid in full, then they "shall each become entitled to receive only such portion of the shares of the stock to which he would be entitled under this agreement, upon the full payment of said sums, as the amount paid by each respectively, including the earnings of the company, would, after deducting the interest on said sums then unpaid, purchase at the rate of sixty-four dollars per share, and the notes then unpaid shall be surrendered or returned to the party so in default." The contract was to be treated as one made in the State of Alabama, and construed under the laws of that State. The notes given by plaintiff each recited that they were given for 375 shares of stock in the Lumber Company, and contained the following stipulation: "It is distinctly understood and agreed that in case [of] a default in the payment of this note or either of them, that the payees herein, or assigns, shall and may condemn said stock so deposited herewith as collateral, and shall and do hereby agree to accept the same in full satisfaction and discharge of all liability on this note or the other two, so that there will remain nothing due on any of said notes." Plaintiff and Hamil each made the cash payment and gave the notes provided for in the contract. Plaintiff alleges "that he would not have entered into said contract, nor would he have purchased said stock, but for the fact that it was distinctly understood and agreed that he and the said Hamil, as long as they were connected with the said business, were to own together a one-half interest in said company, or one-half of the capital stock of the said company;" and that he and Hamil, "by reason of their skill and experience in the manufacture and sale of lumber, were to have the conduct and management of the business of said company, in so far as the same related to the manufacture of lumber." The company was organized by the election of C. H. Caldwell as president, J. M. Caldwell as vice-president, plaintiff as secretary and treasurer, and Hamil as superintendent. Plaintiff endeavored in good faith to discharge all the obligations the contract required of him. C. H. Caldwell became dissatisfied with Hamil, and over the protest of plaintiff the defendants bought the stock owned by Hamil, in violation of the terms of the contract, and thus secured a ma-

jority of the stock of the company. Defendants, after the purchase of Hamil's stock, were guilty of such gross mismanagement of the affairs of the company as to sacrifice the interests of the stockholders, as well as the interest of plaintiff, and he was powerless to prevent the same, but he entered his protest against the manner in which the business was being conducted. By reason of the gross misconduct of defendants, plaintiff "has been forced to retire as near and as well as he could from said company; he having informed said parties that by reason of their continued violations of said contract he would not put any more money into said company, or for said stock so agreed to be purchased by him." If Hamil had been permitted to remain in the company and plaintiff had been allowed to manage his department of the work, he would have complied with his part of the contract and paid the balance due on his notes; but plaintiff "being deprived of the management and control of said business except at the pleasure of the majority, which was not contemplated when he entered into said business, he simply refused to pay any more money on the said stock, and insisted that by reason of these violations of said contract upon the part of the [defendants] he is entitled to the one hundred and eighteen shares of stock paid for by him, and that in equity and good conscience he is entitled to the same; that his refusal to pay for the balance of the stock or to comply with his agreement to pay for the same in accordance with the terms and conditions of his contract was by reason of the constant and continued violations of that same contract upon the part of the" defendants. The stock being purchased at the rate of $64 per share, $7,500 would pay for 118 shares, and plaintiff is entitled to that number of shares or the value of the same, $11,800, the remainder of the shares being sufficient to pay the notes of plaintiff. The prayer of the petition was, that the defendants be required to either deliver to plaintiff the 118 shares of stock or pay him the value of the same, and that the notes of the plaintiff be delivered up and cancelled. An amendment filed by plaintiff alleged that since the suit was brought defendants had sold the stock of plaintiff held by them as collateral security, such sale having been made in violation of law and of the agreement under which it

was held. Not only was no notice of the sale given to plaintiff and the stock not condemned in the manner provided in the note, but the defendants became the purchasers of the stock, which was itself in violation of the contract and the law governing the same. To the plaintiff's petition C. H. Caldwell, who was the only defendant that appears to have been served, filed demurrers both general and special. The court sustained the demurrers, and to this ruling the plaintiff excepted.

1. The agreement relied on by the plaintiff was, save as to the contingency of the death of the plaintiff and Hamil or either of them, an entire contract for the purchase of 375 shares of stock at a given amount per share, payable partly in cash and the balance in installments, and there was nothing whatever in the agreement to authorize the claim that the mere payment of a part of the purchase-money would entitle the plaintiff to demand that the number of shares which such amount would purchase at the stipulated price should be delivered to him. Only in the event of the death of the plaintiff and Hamil, or either of them, was the contract to become severable. In this contingency, and only then, would the plaintiff or his legal representatives have a right to demand a delivery of any of the shares until all of the purchase-price of 375 shares was paid.

2. There was nothing in the contract which would prevent the defendants from purchasing the stock of Hamil, nor was there anything which could be construed as a stipulation that plaintiff and Hamil should always own one half of the stock. Such being the case, it was not a breach of the contract for the defendants to purchase the stock of Hamil and thus obtain the control of a majority of the stock. Even if such conduct on the part of the defendants and the gross mismanagement alleged to have resulted therefrom constituted a breach of the contract, this would, at most, give the plaintiff the right to rescind the contract and recover damages from the defendants, and would not have the effect of changing the nature of the contract so as to make it severable instead of entire. Conceding that the allegations are sufficient to show that there has been a breach of the contract by the defendants, this does not alter the character of the contract so as to confer upon the plaintiff a right that he would not have if the contract had not been broken.

3. If the defendants, in violation of law and in violation of the terms of the contract, attempted to sell the stock of plaintiff which they held as collateral security for the payment of the notes held by them, and at such pretended sale became themselves the purchasers, it is clear that they obtained no title; the status of the title to the property would not be changed or affected by such proceedings, and the defendants being still in possession of the stock would be bound to give effect to any right which the plaintiff had under the contract. The plaintiff had the right under the contract to pay his notes and demand that the 375 shares of stock be delivered to him; and he still has this right, notwithstanding the alleged sale, if the sale was either illegal or in violation of the terms of the contract. The petition did not set forth a cause of action, and there was no error in dismissing the case on the demurrers filed.

*Judgment affirmed. All the Justices concurring.*